Good morning. Please be seated. We're here for the in-bank argument, United States v. Hernandez-Estrada. Judge Gould, appearing by video, can you hear us? Yes, good morning. I can hear you fine. You're coming through loud and clear. And I believe Judge – no, that's it. Okay. Counsel ready? Okay. You may proceed. Good morning, Your Honors. Michelle McKenzie of Federal Defenders of San Diego on behalf of Mr. Hernandez-Estrada. Using only the absolute disparity test to measure jury representativeness does not make sense when you're considering a population like African-Americans in the Southern District of California. This Court's current threshold for absolute disparity at 7.7 percent would permit the complete exclusion of African-Americans in our district or really any minority group that doesn't arise above that 7 percent level. Do I understand that you're only arguing for the adoption of the comparative disparity test for small populations? No, Your Honor. I think that the approach that this Court should consider is that adopted by the Third Circuit. The Third Circuit looks at all three measures typically used in these types of challenges, absolute disparity, comparative disparity, and standard deviation theory. In addition to that … So you're not just using that test for small populations? That's a difference from what you're hearing? No, Your Honor. I think that comparative disparity provides additional information when looking at a small group, but I think that this Court can formulate a test that can be used by district courts on a case-by-case basis based on the information that they have in front of them. Did you ever talk to the district court about this problem? Yes, we did, Your Honor. In fact … Did you ever brief it to them? Yes, we did, Your Honor. In fact, it's in the ER from pages 236 to 240 in our motion. It's in the government's motion as well from 164 to 66. We discussed the significance of Smith and this Court's prior precedent. If I look there, that's the best you've done to the district court? In terms of presenting both absolute … I'm sorry, all three, absolute disparity, comparative disparity, and statistical significance test, that information is before the court. Did you ever brief or argue this issue before the original panel, three-judge panel? Your Honor, we didn't ask the three-judge panel to change this Court's precedent. The three-judge panel, in our opinion, was without the ability to change prior decisions. Well, just a minute, just a minute. Without the ability, that doesn't stop anybody else. There seem to be many who make those arguments to the three-judge panel, and they always say, well, we'd have to go on bonk, and they say we'll go on bonk to do it. But I didn't see anything in your argument to the three-judge panel about this. Your Honor, on page 64 of our opening brief, we note to the three-judge panel how the absolute disparity test in this circuit would serve to exclude entirely the African American population in the Southern District. That's at 64 in our opening brief. But I guess the worry that I have is that where you want me to go in this particular case seems to have no evidence in the record, nothing where the district court could have given, if you will, a comparative disparity test or absolute disparity test or even tried to do a standard deviation. And because really this issue didn't come up that way and nobody said anything to the three-judge panel, then you're asking us to do it. I guess my worry is I had a statistics class in college and didn't do very well, don't think I'm very good at it, and I don't know my colleagues that well, but I guess they know about that. And so I guess I'm trying to figure out why is it that I have to determine this now? I appreciate that my chief judge likes to correct error when he can, and he says a lot of stuff to make that happen. But it seems to me that what he's really saying is take this to the district court, give us a case that really concentrates on this, and let us do something about it, and then we can really address this, because I think it isn't fair. He may be right, but I'd really like to have something to look at. And my worry is you didn't give me anything. Well, Your Honor, I think if you look at page 514 of the ER, you will see our expert analysis, analyses under all three measures were in fact presented to the district court under absolute disparity, comparative disparity, and statistical significance tests. As I said, our motions before the district court raised this issue, discussed Smith, discussed the circuit's precedent, which is absolutely fair. Wasn't there an affidavit by two experts that was submitted to the district court? That's correct, Your Honor. That's part of the record in this case. Abenson, the affidavits are Abenson and Rose? That's correct, Your Honor. And they worked through? They worked through. Through these various approaches with the data that they have, although they do say that the underlying data was not good because of the statistic of the data keeping that the district court followed. As to the Hispanic population, yes, we were missing a significant portion of the Hispanic population in the Southern District of California. I have a question, Ms. McKenzie. If we were to agree with you, we would reverse this conviction, is that right? Yes, Your Honor. And then what, it would go back for what? Well, I think that this Court has two options. This Court independently and nondeferentially reviews these decisions of the district court, so this Court could evaluate the evidence that is already in the record at 514, the evidence, the uncontroverted evidence that we presented from our experts, and evaluate under whatever test the circuit formulated. Or the Court could reverse the conviction and remand to the district court for reconsideration under additional methods. And would this jeopardize every other conviction in the Southern District from 2009 on? No, Your Honor. Why not? I don't believe so. Why? There have been two other wheels since the 2009 wheel that is an issue in this case, 2011 and 2013. The Jury Selection and Service Act, section 1867, makes very clear the timing requirements for the filings of these types of motions and requests to dismiss the indictment or to challenge proceedings. To my knowledge, there are no other cases pending in our district where this issue has been raised and there is that time required within the act. Challenges have to either be raised before voir dire under section 1867 or within two weeks of learning that there could be a possible violation. Is there in the counsel further development of the factual record that could be done such that remand should be considered in this particular case? I know that the number of individuals who did not respond to the race, ethnicity question was quite high, but has that train pretty much left the station? What can be done about it at this point? I'm afraid with regards to the non-responders to the race question and to the ethnicity question that the train has in essence left the station, I don't know how we would go back and identify, you know, looking at the record, the number of non-responders is considerable. I suppose the district court could reach out and try and identify those people. But I don't know. Do you think the non-responders would be compelled to state their race? Well, under the statute. Under criminal sanction? Should prospective jurors be compelled to state their race under criminal sanction? I don't think so. But the district court is compelled under the act to collect that information. And it's attempted to, and they didn't answer the race question. Well, under the Jury Selection and Service Act, there are actually a couple of problems with the methods in which they attempted to collect that information. One is, after the Jury Act passed in 1968, at that time, the collection of this data was not mandatory. Four years later, Congress realized a lot of people aren't responding to the race and ethnicity information. Litigants who want to make these claims don't have reliable data. So we're going to make the giving of that information mandatory. But they're supposed to go back to the non-responders, but they didn't do it. Exactly. So what can be done about it at this point? If I understand your argument correctly, the expert declarations essentially provide the data that the Court can now assess, determine whether there has been a violation of the JSSA in the Sixth Amendment. So we can take a look at that evidence that you presented. So what would remand achieve? Your Honor, I think that the Court has a full record, at least as to the race question. The rate of response was sufficiently high that our experts felt that they could extrapolate from the unknown race responders to the known. The same was not true for Hispanics. The rate of nonresponse was so high that they didn't feel that they could extrapolate confidently into a statistically significant answer. You know what concerns me, counsel? Even if you get past the waiver issue on your opening brief, it's pretty clear that there would be a fair cross-section of the community and that there would be objective criteria. Under any of the three proposed, either the current one or the two other possibilities, I'm having difficulty seeing whether a fair cross-section requirement is any different. I mean, you've got pretty much that issue is not a statistical question. It's another kind of a question. It's a fact-based question other than through statistics. And how do we solve any problem? What you're looking at, don't we ultimately have to come back to that first prong and deal with it regardless of which statistical method you follow? If I understand the Court's question correctly, as to the second prong in Durand, whether or not there's a fair and reasonable representation of African-Americans in our district found on the wheels and in the community, well, most courts have held that it is at least in part a mathematical exercise. So the Court can consider statistical data, right? Like absolute disparity, comparative disparity, standard deviation analysis. And so through looking at the evidence that was presented in this case on 514 of our ER, the Court can see whether or not the representation appears to be fair and reasonable compared to what we know the African-American, the eligible African-American community to be in the Southern District of California. And what you see over that 10-year period, over those six wheels, is constant underrepresentation. We're always hitting under where we would expect that we would be if our wheel wasn't represented. Kennedy, that's the problem, isn't it? What you expect it would be. I mean, you look at the way the circuits have treated different things. And under each formula, there are certain standards that have been found to be acceptable. Like in our case, the current one, a disparity of up to 7.7 percent. So you have vast differences under the others. But everybody's just trying to do it right. And it seems like what you're proposing is, for a statistical nicety, you, as one of my colleagues has suggested, put in jeopardy the convictions or indictments of potentially thousands and thousands of people. This has been around here for 40 years, this particular rule. Yes, Your Honor. But I think if the Court looks to what the Third Circuit is doing and how it's working for that court, looking at all three tests, they look at three additional factors that I think will alleviate in some regards the concerns that the Court has articulated. Kennedy, are you referring to Ramser v. Byer? Yes, Your Honor. Let me see those statistics. The actual disparity is 14 months. That's correct, Your Honor. So that was greater than the one in our case. Yes. In either case, either blacks or Hispanic Americans. That's correct, Your Honor. The comparative disparity was 39.3. I believe ours was 40.87 and 35.96. That's correct, Your Honor. And then the standard deviation was 28.9, and ours was 1321 to 1533, if you take the outliers out. Yes. So why doesn't the Third Circuit standard apply to affirm the judgment in this case? Because the Court in the Third Circuit applies three additional factors, all of which weigh heavily in Mr. Hernandez's favor. The first is that the Court looks at the strength of the evidence purporting to show an underrepresentation. In Ramser v. Byer, the Petitioner presented a subset of the jury wheel. It was a telephone survey of about 700 people and then a geographic survey that covered only a small fraction of the people actually on the jury wheel. So the Court was going to say, I don't want to talk about it, but you want to talk about different evidence that we would consider. No. I'm happy to talk about the statistics as well, because the Third Circuit said, yes, this looks like it would be significant under absolute disparity. It looks like it would be significant under comparative, and it looks like it would be significant under standard deviation. But because we look at these three additional factors, the strength of the evidence, the length of time of the underrepresentation, and then third, the nature of the process by which jurors are identified, excuse me, under those three additional factors, we weigh the evidence in front of us, and we are not convinced that a violation has been shown in this case. But under the case of the Petitioner, we weigh the evidence in front of us, and we are not convinced that a violation has been shown in this case. Sotomayor, I don't know if you want to comment on that specifically, but are you saying that there should not be any difference in analysis for a small sample size? Well, I think the Court, if we were to adopt the Third Circuit's approach, the Third Circuit looked at the small sample size and the brief duration of the study in that case, which was only two years, and they said, this does not really give us confidence that we understand what is happening in New Jersey jury selection systems. So the sample size in that case, the Court, the Third Circuit, did hold against the Petitioner. I'm asking your view of what role small sample size should play. For instance, if you had a population of 0.8 percent and it was underrepresented at 0.4, is that the same as 80 percent and 40 percent for, you know, does it even make sense to look at those in the same way? I'm sorry. I misunderstood the question. So the small sample size meaning the size of the community that we're discussing? Correct. I didn't express it correctly. I apologize. I think that question is relevant, and it gets the concern of a lot of previous decisions of courts across the country, that if we're dealing with a really small community, how are we ever going to really capture them? And that's really one of the reasons. Isn't that what standard deviation analysis does? In fact, it does. That's one benefit of using something like standard deviation, is it tells you when you're dealing with a population that is very, very small, the standard deviation would approach zero. Any particular wheel that that person or very, very small minority doesn't appear on would likely fall within one, two, or three standard deviations of what would be expected because the sample is so small. So the formula for standard deviation actually goes to the community. So small. Yes. It takes into account the relative size of that community and the relative likelihood that that community would actually be sampled during the process. We've been talking about we've got a constitutional challenge. We've also got a statutory challenge. And I don't know the answer to this, so I want to review. Is there any difference in your view in the standard or the approach, whether we go into the constitutional challenge or the statutory challenge, or are they both equivalent, that the statute simply adopts a constitutional test and vice versa? It's, you know, it seems that prior case law of this Court has treated the claims similarly because the statute embodies the fair cross-section principle and embodies the equal protection principle. I don't know that there is a reasoned basis to approach it differently. Well, I'm actually thinking about the ‑‑ there is a sort of harmlessness aspect to ‑‑ there has to be or else. And I'm just wondering, the constitutional standard for harmlessness is pretty ‑‑ is somewhat forgiving just across the board in terms of constitutional error, it has to be really, really bad to result in a reversal. And I'm just wondering, is the statute more stringent, or is it down the line? Is the constitutional standard and the statutory standard the same? Now, it may not matter in this case, because, of course, both apply, but I'm just wondering whether, when we write an opinion one way or the other on this case, whether this is something we need to pay attention to. Well, the statute did, at least if you look at the legislative history of the Jury's Selection and Service Act, Congress contemplated a harmlessness or a prejudice requirement and decided to not apply a prejudice requirement. When they talk about, you know, certain deviations from the Act perhaps would not be significant, they use the example of if you were supposed to draw 2,000 names and you draw, they say either 1,900 or 1,990 names, that's the kind of example that would not be a substantial violation of the Act. So the language in most cases used, and I believe that the Act is as well. But it might not be a violation at all. Yeah, I mean, there might be a violation. If it's not statistically significant, it's not a violation at all. So I'm teasing out your answer. Your answer is basically if you find a significant violation under the Act, there is no harmless error. There is no, you don't apply harmless error analysis. You don't apply harmless error analysis. But this Court's previous cases have held that there has to be a substantial violation of the Act. Well, the statute says so, because it has to be only substantially proportionate representation in a fair cross-section. It doesn't have to be mathematically exact. And I guess my other question is, perhaps betrays what Judge Smith was referring to as our collective ignorance about statistics, or at least mine, and that is that the statute specifies the use of the voter lists as the standard and other lists only as necessary, and a voter list is not random. Is the standard deviation analysis intended only for random populations? Because it seems like there's you'd be applying something that's intended for random populations to something that is by definition not random and is the default under the statute, and I guess I'm having a hard time matching those two in my mind. Okay. Well, I think there are two parts to that question. One is, you know, did Congress express an unequivocal desire that voter registration lists not only would be the starting point, but would essentially functionally be the ending point? And they definitely designated in 18 and section 1863 that they would be the starting point, but then they immediately went on to say that the plan shall prescribe some other source or sources where necessary. We're necessary. Okay. We're necessary. So that already says if it's not necessary, we don't go beyond it. But all those other sources are also nonrandom, which takes to the second part of my question, which is why, now you have several nonrandom lists, why is standard deviation analysis appropriate for that? Well, because I think that in standard deviation analysis, two possible questions can be answered. You know, is the list that we are using, we have what's called a binomial distribution, kind of like a bell curve, right? So the first question is, is the list that we're using a fair and reasonable representation of the community? And the second is, assuming random polls, right, are the results that we're seeing reasonable? Will they fall within a predicted value? In Castaneda, they were only measuring randomness, right? So that question was really isolated. Here, we can assume some degree of randomness, because the list should be a fair and reasonable approximation of the African-American community. There should be no more or less likely that certain African-Americans would be picked or certain women would receive questionnaires at least the master wheel level. So we should be seeing, you know, if those lists are falling short of the fair cross-section requirement, then that would measure statistically significant under the standard deviation model. So I think that we can assume some randomness, maybe not perfect statistical randomness, but we can be testing where our — where the source list is, if it is, in fact, a fair and reasonable representation of the community. But that's actually the question that you're answering. It seems circular to me, because you first have to look at the voter list and determine whether it is necessary to go beyond that. And it seems to me to be the way the statute is set up. Absolutely. And the statute says, you know, if the House report had only said we start at voter lists and there is no supplementation, then I think that that would make sense. We're not in disagreement about what the statute says, I think. It says voter registration or voter lists. Registration is the wrong word. But the voter lists, unless it's necessary to go beyond that. And then there are some other things that you look at. So the question, the initial question is, is it necessary to go beyond it in order to obtain a fair, substantially representative, not precisely representative, but substantially, whatever that means. And I think the answer in this case has to be yes. If you look at Table 7 — or Table 3 on page 54 of our opening brief, we set forth what the different registration rates are of African-Americans compared to non-Hispanic whites. It was over 5 percent in 2008. It was over 17 percent in 2006, you know, 5, 6, 11 percent. It's substantial underrepresentation on those voter lists. And once you see that — Kennedy, how is it substantial? Isn't that a defined term in terms of the case law? How is this a substantial underrepresentation? I think the Court should look to the language that Congress used in passing the Act. And they say that they're not requiring at any stage beyond the initial source list that the selection process shall produce groups that accurately mirror community makeup. So they're contemplating a source list that essentially mirrors the community makeup. And then they recognize immediately that in some areas, voter lists of all kinds are going to be insufficient to implement the policies of the Act by reason of local voting practices. So they contemplate that in some areas, like the Southern District of California, there are going to be certain groups that are either not going to be found on those lists or are going to be found in substantially lesser proportions that render supplementation necessary. And this Court's own Jury Trial Improvement Committee recognized that fact, as well, nearly a decade ago, recommending supplementation to every district throughout the surrogate. Kennedy, but the Supreme Court has never really blessed any particular thing because it recognizes that the realities on the ground are such that there is no perfection in this. It has to be substantial. And I have not found any case law, and would appreciate any that you might suggest, that would find that applying any of the three formulae to your client's situation would result in a reversal. Please tell me where I'm wrong. I think that if this Court looks at the En Blanc decision from the Third Circuit, Ramser v. Fyre, the three factors that they use all weigh heavily in our favor. If this Court also looks at Rogers, which was cited in our petition for rehearing an Eighth Circuit case. They're looking at an African-American population that's less than 2 percent of the population, an absolute disparity of about 0.59 percent that occurs over 5 years. And the length of time of the underrepresentation, the fact that they're only using voter lists like they are in the Southern District of California, troubles the Court. And the Court says that they would consider that to be a prima facie violation that defendant statistics establish at a minimum a prima facie case that blacks are being systematically excluded. And that's with an absolute disparity of 0.58. But there is no such finding in this case, is there? No, because the Court was forced to use only the absolute disparity measure and evaluated against that 7.7 percent. Let's apply standard deviation in this case, Hugh. How do you get the substantial underrepresentation that you're looking for? And how do you prove that it reverses your client's conviction? Because the likelihood of what we're seeing happening in the Southern District of California, wheel after wheel after wheel over a 10-year period, is so infinitesimally small if the wheel were actually representative of our community, that the Court has to find that something is amiss, that the length of time. And that's from Duren as well. They look at the repeated nature. Duren's undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly veneer for a period of nearly a year. Along the lines of Judge Smith's and Judge Graber's questions, are you familiar with the disparity of risk analysis, which assesses the impact that underrepresentation would have on the likely composition of juries in order to address the question of whether the violation is substantial, and have you conducted that analysis? Your Honor, no. I know that disparity of risk was suggested in the law review article as a possible means, but I think that this the measures used by the Third Circuit, I think, provide a full picture and could provide a full picture in this case. Why would you want to confine that, though? It's your burden of proof. You have different statistical measures. I mean, it seems to me if you show statistical significance in any of them, that's a measure of the burden of proof. I mean, that's why I'm wondering, why would one want to confine to define standard deviation or the other two methods? I think there are alternative methods there that are available that might be superior. For example, for Judge Graber's problem, you can control through a regression analysis some of the nonrandom factors and come out with a little more predictive capability. True, Your Honor. And the burden is on Mr. Hernandez, and I think that we've presented evidence across different measures. Our experts used what's called the Fisher's exact test and estimated the likelihood of the disparities. I just have a mechanics question. For each wheel, you don't know – I'm sorry, this is a question, not a statement. I gather you don't know what the makeup of the wheel is until it's been completed. And isn't that sort of an ongoing process over the period of months? In terms of the formulation of the wheel, so the names go in and then questionnaires go out, and then not until you get the questionnaires back do you know what the process is? Yes, that's correct. But the court then does a self-evaluation process whereby they look and see whether or not they should be doing a self-evaluation process. This district hasn't. And what happens in the meantime? Where are they getting – I mean, you need juries every day, right? Yes. And I'm just trying to understand what the process looks like. Do they sort of work through the old wheel and then start the new wheel process before they start the one? I believe, Your Honor, I'm – the mechanics of that I'm not confident on. I know that they're continuing to receive questionnaires when they're still drawing names for actual grand impedit juries. So names could continue to be added to the wheel. I mean, my concern is you could have a trial of somebody in the beginning of the wheel, and you won't know what the numbers are on that wheel for months later. And then you've got the problem of, you know, all of a sudden the numbers come out, and you've got dozens of cases where you say, whoops, we goofed. Three, Your Honor. And as you said, that's two weeks after you find out the information, right? True, Your Honor. But this Court – I mean, excuse me. The district court knows that they are starting – they know that they're starting from the voter registration roll. So they can look and see, you know, the likely – you know, assuming, again, that the draw is going to be fairly random, that the likelihood that they're going to net a representative jury starting from that unrepresentative point. Based on – based on? On random selection. On surnames? I mean, you obviously can't tell color. I mean, you can't tell race by – from a list of names. You might be able to tell Hispanics. You're certainly not going to be able to tell a lot of other subgroups, right? Right. But I think if the question – And not all Hispanics are called Gonzales, you know what I mean? You know, or have hyphenated names, right? So how can you tell as you're going along to avoid creating problems if you're having a nonrandom distribution? Well, I think our district – I mean, speaking of our district, our district could have told – could have decided in one of two ways. I mean, they could have tried to start from the beginning with a multiple-source list, which is a well-accepted process to try and gain the most representative source of jurors. The eastern district does that. There's seven districts throughout the Ninth Circuit that do it. And in addition to the recommendations of this Court's committee, the district court in this case himself found that it would not be difficult to do, that the busy trial court, the State court across the street from where he was sitting, already supplemented with DMV, showing the feasibility and practicality, the Court said that it's not difficult or overly expensive to do. And, in fact, he couldn't conceive of any reason not to supplement. That was originally in 2009, repeated in 2011, and still we have the exclusive use of what source list that we know underrepresents. My time is up. You're out of time. We'll hear from the government. May it please the Court. Victor Pablo White for the United States of America. Appellant seeks to dismiss his indictment for a violation of the fair cross-section requirement of the Sixth Amendment and the Jury Service and Selection Act, but there was no violation here. Here, the population of African-Americans was a little over 5 percent, approximately a little over 3 percent made it onto the jury wheel, which resulted in less than a 2 percent underrepresentation. The actual number was 1.7 percent underrepresentation. Alito, 5 percent and 3 percent sounds like a 40 percent difference. Well, the comparative disparity, when we looked at it, was 32.8 percent in this case, which, again, within the comparative disparity that was calculated by this Court in Sanchez-Lopez, even though the comparative disparity test isn't favored in this district, was upheld. Other circuits that have applied comparative disparity have also accepted comparative disparities within this range. Well, in any event, it's not 2 percent. I mean, to say it's 2 percent sort of begs the question. It's one way of saying it. I mean, it is a difference in the two groups. If you had 500 people, you'd have, instead of 500 people, you'd have 300 people. I mean, you know, the difference between 3 percent and 5 percent is not only 2 percent in the sense of the entire group, but in terms of the size of that population. It's really quite significant, right? Well, this Court If you start off with Lee's, oh, it's just 2 percent. But it's not 2 percent. Well, it would be the equivalent. Since no court has required a statistical mirror that the 5 percent in the population has to be on the jury wheel, it's not substantial. It's not what other courts have found to be substantial. Yes, it ends up being approximately 600 African-Americans, but this Court in the 1970s and up until the Suttaswad case was also looking at something similar to what Judge Wynn was asking about with risk analysis, where they're looking at how many more people. If you took a population that was 50 percent instead of 5 percent, so if we just multiply it by 10, and it turns out there were only 30 percent in the wheel, whereas that population was 50 percent of the population, you'd have a 20 percent disparity, right? And that would be quite significant. And yet, proportionately, it's the same as the difference between 5 percent and 3 percent, right? There's no difference in terms of population. Right. But under the comparative disparity analysis there, it would be well over 50 percent. You know, you keep giving me stuff about comparative disparity analysis. Let's just talk facts. Okay. You know, if you have a population that's 50 percent of the — if you have a group that's 50 percent of the population, and only 30 percent of them regularly, year after year, wheel after wheel, shows up in the jury pool, then you would agree there is a problem there. I mean, you know, I don't care what you call it. It could be standard deviation or comparative analysis or anything else. You would have to say, boy, that's a problem. That's really a problem, right? Year after year, that kind of disparity, yes. Yes, we'll do. Yes, yes, yes, we'll do, right. Is there — I'm going to ask you the same question I asked opposing counsel. Isn't there something different about a very small population? Isn't there something conceptually different about .8 versus .4 that's different from 80 percent and 40 percent in terms of just the actual predictive value of what you would expect to see on a jury pool? Absolutely. I mean, if you have .8 versus .4, basically you're just not going to see that group much, because there is hardly anybody in that particular hypothetical group. And so what do we do? No, wait a minute. I'd like to hear counsel's answer to that. Well, I want — I just want your comment on what difference it makes if the group is small. Well, I think there has to be — Wait, wait, wait. Could you answer Judge Grable's question first? Do you think the two are — that it makes no difference? It does make a difference if it's .8 percent, because, again, the cross-section isn't proportional cross-section. It's a fair cross-section. So if it's .8 percent versus .4 percent to you, it makes no difference. What you apply to the entire population in the United States, how many people does that make no difference? Well, the issue is, again, under Duren, there are the three — Three hundred million people. Under Duren, there are the three prongs. One is the cognizability of the group. And so, again, whether or not a group that's .8 percent of the population, would it be sufficient to be cognizable? In the Southern District of California, we have Native Hawaiians and Pacific Islanders who are half of 1 percent of the population. If all of them were eliminated and didn't make it on to a jury will, that wouldn't amount to unfair and unreasonable cross-section. Again, it's half of 1 percent. And so it's again — So your answer to Judge Grable's question is, if the population is small enough, then you don't ask the question to begin with. There's going to be a level at which this Court's going to have to decide where the size of the group, either it's not a cognizable group because it's such a small fraction of the cross-section of the population. And what is the minimum size you think that makes something a cognizable group? Well — I think that's a fair question. Maybe with small enough percentage, maybe it's not a cognizable group. Well, the concern is always with avoiding some sort of arbitrary number. But you're not arguing that when it comes to Hispanics or blacks, those are not cognizable groups. No. We're not disputing — So we're dealing with those here, which is a challenge, a particular challenge that happened in this case. We are dealing with cognizable groups. That's correct. And you do agree that when it comes to those numbers, differences are significant? No. The differences that were found here weren't significant. The difference is here of less than 2 percent, less than a 35 percent comparative disparity. Even if we were to use standard deviation, which was never applied below, as Appellant points out, their expert used the Fisher exact test, which was looking again at what's the chance sampling and not basing it on the Castaneda v. Partita standard deviation test. But again, looking at the disparity that was measured here, there is no significant — constitutionally significant underrepresentation of either African Americans. And as Appellant pointed out, there's too much missing data to really calculate for a standard deviation analysis for Hispanics. But even looking at the absolute disparity that was looked at here, and this, the nine — What do we do with the missing data? The district court has a responsibility under the statute to collect the data. And there's at least some indication that there weren't as many — the efforts to collect the data weren't as diligent as they might have been. And the efforts, as the panel opinion pointed out, there were a series of recommendations that the district court then implemented. One of them, as far as improving the response to the race and ethnicity question, was to follow the panel opinion's recommendation of allowing for the online submission of questionnaires, where questions have to be answered in order to be able to submit those questionnaires. So there were — the panel opinion's recommendations were heard loud and clear, and there were efforts to make remedies in the Southern District of California. Well, that's fine, but, of course, it doesn't apply to this case. So the question I ask still stands. I mean, it's commendable that they've changed things, but we're still dealing with a situation where the district court's efforts weren't, arguably, they weren't as diligent as they might have been. The district court has a responsibility under the statute to do that. What do we do about it in this case? Do you say, ah, too bad? Well, I think, again, in this case, the panel opinion already looked at what was going on with the district court, what were the practices that needed to be improved upon, and found no substantial violation. Because, again, the test under the Jury Service and Selection Act isn't — is this a technical violation? I think it's fair to say that the panel was ambivalent. Your Honor would know better. I think it's fair to say, just based on the published opinions, right? Yes. I mean, clearly, clearly the panel was not pleased with what was occurring in the Southern District of California that hadn't been corrected. Let me ask you, in the Southern District of California, is there some sort of cooperation between the district court, the U.S. attorney, and the public defender in vetting these lists when they, you know, is there any kind of involvement by the — I mean, this seems to me, it strikes me that this kind of thing should be a collaborative effort, getting a fair cross-section of the community, and the jury should be something that's in the interest of the court, in the interest of prosecutors, and in the interest of defense as well. Is there any kind of process like that to — To my knowledge, this is one where the separation of powers has been put in place and judiciary, the district court, is following its plan. However, the recommendation — Is there a big no? That's correct. But to my knowledge, I'm not aware of that. However, this is an area that, again, as the — We do have a committee that has recommended a multi-source approach in terms of — and other districts in this circuit have followed that. One note to caution is the Supreme Court — I'm not urging the district court to, you know, comply with the law. I mean, after all, the President, the head of the executive branch, signed the bill into law. Well, Your Honor, absolutely. There's an interest in seeing a more representative jury. There's an absolute governmental interest in that. But there's a difference between what could be done, what could be improved upon to make it more representative, versus what's amounting to a constitutional or a statutory violation. Well, to that end, if — looking forward, if you were riding on a blank slate, we didn't have the circuit precedent that confined us, what rule would you advocate that we adopt? It seems to be that the Tenth Circuit in the United States v. Orange case decided to use an absolute disparity and comparative disparity test. And the reason that they used that is, they said, absent any showing of intentional discrimination or purposeful discrimination, they weren't going to look at a chi-square or a standard deviation analysis. One thing that's difficult in this area is there's a blurring of the lines between the second prong of Durant, which is showing the underrepresentation, basically, that those that are in the community are — how many are not making it onto the jury wheel, versus the third prong of Durant, which is systematic underrepresentation. Here — or systematic exclusion, I'm sorry. Here there's been no showing of systematic exclusion. And in the Castaneda v. Partita case, where they're really looking at, again, in the full protection context, what is a process that's susceptible to discrimination or that's susceptible to abuse? Standard deviations seem to make more sense in that case. But here, as a number of the judges have pointed out, there are too many unknowns, too many variables. Even applying a regression analysis in this case wouldn't solve a number of those unknowns, because as the Second Circuit pointed out, the voter registration list, which is, again, the primary source for sending out questionnaires to prospective jurors, is inherently nonrandom. Counsel, do you agree with the polls in counsel that a reversal in this case would not disturb prior convictions in the district? No, I don't. And, in fact, in the Southern District of California, for the 2010 year, there was over 900 indictments that were returned. For 2011 and 2012, there were over 1,000 indictments each year that were returned. And so, again, since we're not dealing with just a jury service and selection violation, but potentially a Sixth Amendment violation also, the bar that defense pointed out. But what about counsel's – I mean, I think the reason she said that, as I understood it, was that there was time limits for raising these objections. And according to counsel's representation, she said she was not aware of any cases that raised a timely challenge. So giving raw numbers is a little not on point. The – the – Are you aware of cases in the pipeline that have this challenge so that a ruling on our part would affect those cases? I'm not aware of ones that are in the pipeline. But the concern, again, with any sort of ruling would be for whether or not there could be a showing of there couldn't have been a filing of this because the data, the underlying court precedent had been absolute disparity. But it is fair to say, I mean, you say there have been 500 or 1,000 indictments. That's sort of a number that's not on point. I mean, the concern, if any, is that even though these might be time-barred challenges, there might be some way of equitably opening up the time period. Is that right? Right. So there would be some sort of tolling of the time bar. So your answer to Judge Rawlinson's question, to give a full answer rather than just sort of a is maybe. Maybe, and you need to explain what are the chances of that, what are the possibilities of opening up a challenge like that. Maybe under the argument that basically the Ninth Circuit's precedent had been absolute disparity, while as the panel pointed out, there had been no bright line, no exact line that had been drawn of 7.7 percent. It is being raised now in light of this Court's. So how would it come up? Does the ineffective assistance of counsel claim that counsel should have raised this issue but didn't or something along those lines? It would be something akin to that. I read somewhere that from a certain point on the Federal defender was filing protective motions in all cases from a certain point on. Is that correct? Do you know what that's about? I'm not aware of that. Let me ask you a practical question. You seem, I mean, you would advocate the Tenth Circuit test. Your opponent advocates the Third Circuit test.  I mean, it seems to me we're a little bit ill-equipped to decide the case here on the basis of a new test. Would you advocate sending it down to the district court to apply the test? I think if this Court were to look at the figures that have been presented and look at the absolute disparity or the comparative disparity test, there would be no reason to remand it. If this Court were to consider the standard deviation analysis for the reason that it was never litigated before the district court, while there were an expert affidavit that included mention of the Fisher exact test, there was no litigation as to standard deviation. There's the problem with sampling here. There's the number of unknowns that would have to be dealt with here. And so I would recommend remanding back if the Court were inclined to apply the standard deviation test. Why would we confine, if we're analyzing tests, why would we confine it to just two or three? I mean, it seems to me in every case, as you pointed out, there are going to be some statistical anomalies, and one size may not fit all in each particular case. You could do a chi-square in some cases. You might do some different kind of analysis in other cases. So why would we adopt a rule? Why would we want to adopt a rule that confined it to either or? Well, I think, again, to a certain extent, it has to do with ease of use. The reason that absolute disparity and comparative disparity are being mentioned and are being used, it seems, by the Tenth Circuit is they've been used for at least absolute disparity for over 35 years. Comparative disparity and its limitations have been pointed out for at least 25 years. Counsel, I'm puzzled as to why we, a Court, that can't take testimony from everybody and get their input or even involved in this, isn't this really a legislative or an executive matter where you can get testimony, get experts in, make some value determination? We're just guessing at this stuff. We have some things from some of the other circuits. We have our own precedents. But when it gets right down to it, the defendant bears the burden to show that he in this particular case has been prejudiced either by a constitutional or a statutory violation. I've not seen any evidence of that. It seems like we're engaged in an interesting analysis of whether our system can be improved, which is a worthy analysis. But is this the proper forum for us to weigh this, as my colleague, Judge Thomas, just pointed out? Why limit it to two? Why not three? Why not four? Why not five different analyses? And who's going to do that? And, you know, perhaps that's where the judicial conference would be best employed. Kennedy, I'm sorry, what's your answer to Judge Smith's question? The answer is, on this record, this isn't the best case for really deciding which is the best test to use. But this is a case we have in front of us. We have a conviction of an actual defendant who is relying on a statute. Why isn't this an appropriate case to consider the question, yes or no? I mean, this is not a hypothetical. This is not a legislative matter where we have an actual conviction by somebody who claims to have been convicted by a jury and indicted by a grand jury that were drawn not according to statutory standards. What's inappropriate? If you're answering, yes, to Judge Smith's question, I'd like you to answer my question. What's inappropriate about deciding this case and this issue in this case? Well, while there were flaws, there was no violation of the statute in this case. It's a different question. What's inappropriate about answering the question? You may think the answer to the question is it was okay, but is there anything inappropriate about answering the question in this case? Is there any way we can escape answering the question in this case, given that there is a conviction and that there is a, you know, there's a man, I guess he's in prison, who stands convicted of a crime and who claims that the system that convicted him violated the Constitution and the statute? You're not going to claim that there's anything inappropriate about our deciding that issue. The issue here and what the district court looked at was strictly the same. Just answer my question, yes? Is it appropriate or not appropriate? It's not appropriate here because the record here wasn't sufficiently developed. Again, there was no other than the affidavit. So we write an opinion saying, sorry, Mr. Hernandez-Estrada, we don't feel like answering your question. You've raised a good point, but we just don't think we're going to answer it in this case. You think that's what we should say? No. You think that's the appropriate answer in this case? The conviction should be affirmed because there was no statutory or constitutional violation. And can we affirm the conviction without addressing this issue? It can be affirmed based on the absolute disparity that was less than 2 percent, a comparative disparity that was less than 35 percent. This Court ---- It would have to be remanded if this Court were to look at the standard deviation test. But with the figures that were provided and with this Court's precedent, since this Court in Sanchez-Lopez applied comparative disparity even though it knew it was disfavored, under either absolute disparity or comparative disparity, there would be no reason to remand. And then following up on Judge Thomas' question, given that the percentage minority representation varies depending on minority group and depending on the population or geographical area, the districts at issue, what is the downside to opening ourselves up to consideration of whatever statistical tools that are available and useful in order to assist the Court in making the qualitative judgment as to whether there's substantial ---- there's been a substantial violation? Is there any downside other than you mentioned ease of use? Anything else? The downside would be as far as ease of use and what would be relative comparison. So what would be the sort of guidance that the Court would give in the application of any of these tests? And I think that raises then the question of is this really the place where we would study other potential statistical analyses? And the Jury Service and Selection Act provides again for the judicial conference to adopt rules and regulations governing the provisions and operation of the plans formulated under this title. So that's true enough, but the judicial conference doesn't cite constitutional questions or questions of statutory violation that are presented here. I mean, the conference can't resolve this case. I mean, it may be a good argument that the conference should take up a broader study in the interest of the administration of justice, but I don't think that means we avoid deciding it here. Do you? No. And as I mentioned, as far as deciding it here, the conviction, the indictment shouldn't be dismissed. The conviction should be affirmed. But going forward, we have the broader question here of what tests to apply going forward if we reach it. And I think that's an important test, because leaving aside this other district, we have many districts within the Ninth Circuit where the absolute disparity test being the significant portions, minority populations, can't be counted. There will never be the one can never raise that argument. And to me, I mean, the absolute disparity test can't survive, really, in the real world application as to those districts. So we're pinning on a broader canvas, and I think you've advocated at least adding one other element to the absolute disparity test. And one other thing that this circuit has already done, going back to the Potter decision, the Klefkin decision, the Armstrong decision, and the Sotuswad decision, is doing a sort of analysis of how many more African-Americans or Hispanics or Asians would be on the average 23-person grand jury. So if we're talking about percentages, this circuit has already advocated looking at it in terms of people. And so because the problem, again, with the standard deviation analysis is that it's going to be what's the likelihood of random chance. It's not going back, again, to the second test under Duren, which is are we seeing unfair and unreasonable representation, under-representation? Kennedy, twice you've mentioned that we can't use standard deviation in this case because some things are missing. Would you tell me what things are missing so? Certainly. In this case, in the excerpt of record at 511, the expert indicated that, again, the test that was being applied was the Fisher exact test, which was looking at the likelihood that the disparity occurred by chance in time. At the jury wheel, which is at excerpt of record 255. I'm sorry. You said excerpt of record 511? 511. It's a table on my 511. That's correct. And then it says at the bottom of the note. The expert said. I don't see anything the expert's saying anything. In the notes, result for likelihood that disparity is attributable to chance sampling and calculated by Fisher's exact test. I'm sorry. This little footnote here at the bottom? That's correct. The one in the smaller. And what is this? This is a table attached to the expert's report? That's correct. So the way that they were calculating random chance was using this Fisher's exact test, which in their table is under the column that's labeled likelihood disparity occurred by chance one time in. And then they would do one followed by a certain number of zeros. Okay. Okay. In the actual. Looks like a lot of zeros. One by a hundred zeros. That's a big number. There are. But again, relative to what? I mean, and that's really what we have to go back and ask the question. If we end up with. Number one followed by a hundred zeros. You know, the chance is something like. That's like DNA testing, you know. It's pretty good stuff. You guys rely on numbers like that all the time to get people convicted. Well, but. You've said it to Jewish, too. It's a one followed by a hundred zeros. But we're looking at, again, the question is, again, is it unfair or unreasonable underrepresentation here? So if we're dealing with such a small group like Native Hawaiian Pacific Islander in the Southern District of California, even if one were to find 100 percent comparative disparity and four or five standard deviations. I'm sorry. They've claimed Native Hawaiians as a disparity in this case? No, it hasn't. Why are we talking about this? Why are you talking about this? Why don't you talk about the groups that they do claim there's a disparity? I'm trying to illustrate the point of why standard deviation is a problem here. Right. But you're kind of mixing apples and oranges. I mean, Fisher's exact test is a test that's employed when you have a small sample size, right? Yes. But, again, if the guidance that we're taking is from Castaneda v. Partita and we're talking in terms of two or three standard deviations is going to be suspect to a social scientist, this Court in giving its guidance to other courts should be making a determination of what's the guidance going to be. Is it going to be in terms of how many standard deviations? Is it going to be in terms of another sort of statistical test? So that's part of what I'm trying to get at with the standard deviation analysis.  The question Judge Barrett asked you that I thought you were answering is why you can't apply standard deviation analysis in this case. It was what was the missing data? We're looking for missing data. The report on operation of the jury selection plan, what's known as the AO 12, excerpt of Record 255, if we look at the number of names in the wheel under the sampling of the qualified jury wheel, we see 40,743. Applying the numbers in Rodriguez-Lara, which tells us exclude the those who don't report their ethnicity, brings us down or those who don't report their race, brings us down to 36,033. So there's 4,710 individuals who we just don't know their race. And this is we're trying to apply what's the likelihood of a random sampling of a random distribution of this group to 4,710 people who could fit into any one of the other racial categories that are listed above. Is there any reason to think that those 4,000 are distributed any differently than the rest of the group? Because you agree that if they are distributed just the same as the rest of the group, it makes no difference. All you've done at that point is just cut the sample size. I'm sorry. The second part of the question? If the people who didn't report are distributed the same as the basic group, then excluding them makes no difference, right? That's correct. But that's an assumption that we've made. Stop. That's a question. It's not an assumption. Is there any reason to believe that that excluded group, the people who didn't answer it, are distributed any differently from the main group? Well, one thing that we saw is that those who failed to respond to the race question oftentimes were Hispanics, too, and that was included in the excerpts of records that was cited by appellant. So there is no way to go back and analyze those who didn't exactly check the box for race. I didn't understand your question, your answer. Did you understand my question? Your question is? Is there any reason to believe that the people who didn't answer the question are distributed any differently by race than the main group? There may be, but it wasn't developed on this record. And the reason I'm saying there may be is? That's your burden. You want to say, look, excluding them makes a big difference. But, of course, if they are distributed the same as the main group, it makes no difference. You've agreed to that already. So the question is, so in order to tell us that this is a big problem, you have to persuade us that they are distributed differently than the main group. Do you have anything to support that? Well, first of all, the burden is on the appellant here. And, again, this was one that wasn't litigated. So the burden would be on the main group. You're running out of time. If you don't want to answer my question, that's fine. But I'm going to give you one more chance to answer the question. Is there any reason that you have, any evidence to think that the people who didn't answer the question are distributed differently from the rest of the group? And the reason there may be is that excerpt of Record 579, there was a previous sampling that had been done in error because it hadn't allowed for the 90 days that were necessary from the time that the mailing was completed. In that excerpt of Record 579, the number of unknowns is actually a little bit higher. It ends up being 12.51 percent. The number of unknowns is 1,370. So that's why on this record, it's not clear what happened as far as the sampling date. As Your Honor pointed out with the question, what's happening if you've got questionnaires that are going out at various different intervals? Our sampling date for excerpt of Record 579 is May 11, 2009. Our sampling date for the excerpt of Record table at 255, which is the one that we've used for computing the absolute disparity, and in this case is September 14, 2010. The numbers that were in the forms were nearly 70,000. It's 69,375. The numbers that, again, were in that one that was prepared in error, not allowing the 90 days after mailing, was 18,332. So, again, the fact that the distributions are a little bit different go back to the point about, does the date that you do the sampling matter? Yes, it does. How would it affect things? We don't know. Kennedy, I'll have to play that back to understand what you're saying. Unfortunately, we have video. Do you, counsel, know why the Southern District isn't supplementing the voter registered voter list, given that the recommendation for supplementation has been on the books for quite some time? Is it a cost issue? I don't know why, and I can't speculate why. I do know that the district judge who had this case before him is now the chief judge. In his order, he did make the recommendation for supplementation. I'm also aware that it appears the Central District of California, as well as the District of Arizona, I believe Guam, Northern Mariana Islands, and several others are using voter registration lists solely. And, again, it goes back to the need to meet with the chief judge, perhaps with the public defender, and look into this and try to regularize the process in a way that more fully complies with the statute, even if it's not a violation. Shouldn't there be an interest on behalf of the U.S. Attorney's representative executive branch to have a fair cross-section? And there is an interest in compliance with the law. There is an interest, again, in compliance with the law and in getting Any efforts made in that regard? Nothing prevents a U.S. Attorney from writing a letter to the chief judge saying let's meet and talk about how jurors are selected in the Southern District. To more fully comply with the law, right? That's correct. And I know that the chief judge was wanting to know the date and time of the argument because he is very much interested in this issue. Well, good. Hopefully he will take into account. I think you are out of time. I will give you a minute or two for a bottle if you want. We'll give you two minutes for a bottle, because much has been said. Your Honor, I think by reviewing the orders in this case, the Court can see that the trial judge in this case wanted to get it right. I think he wanted to be faithful to the constitutional principles of fair cross-section and equal protection, and I think he wanted to be faithful to Ninth Circuit precedent. But this Court's precedent currently only gives him one tool in his toolbox by which to evaluate this claim. Mr. Hernandez is asking this Court for an opportunity to have the evaluation of the ten years of evidence that he's presented, a fair opportunity either before this Court or once again before the district court. Thank you. Okay. Thank you very much. The case is now submitted. We are adjourned.
judges: Kozinski, Thomas, Silverman, Graber, Gould, Paez, Rawlinson, Bea, Smith, Smith, Nguyen